to hold, in trust, to invest and reinvest, to receive the interest, income and profits, and pay the same to my said son, Bradford B. McGregor, and to and for the use and benefit of my said son Bradford B. McGregor, for and during his natural life, and upon his decease, to pay over the principal and any unexpended income to the issue of my said son Bradford, and in the event of his death leaving no issue, then to pay the same to my next of kin then living." Salter v. Drowne, supra, 205 N. Y. 210, 98 N. E. 401.

The learned counsel for the collateral relatives suggests that:

"The fourteenth paragraph was an afterthought, inserted after the will had been drafted; and because the person who drew this will did not in the twelfth paragraph, as in the tenth and eleventh paragraphs, go on and make a complete disposition of the corpus of the trust fund, but attempted to dispose of it by making its ultimate disposition pass under the residuary clause following."

The adoption of this hypothesis would lead us into the boundless realm of imagination—a journey to be avoided by those engaged in the prosaic work of interpreting written instruments.

We think the construction of the learned trial court as to the ownership of the surplus of the fund we have been considering was compelled by the plain language of the will, and that it is in harmony with the entire testamentary scheme of the testator.

The judgment should be affirmed, with costs. All concur.

---

In re GREAT NORTHERN TRADING CO.    (No. 7231.)

(Supreme Court, Appellate Division, First Department.    May 7, 1915.)

CORPORATIONS ⊂⇒610—DISSOLUTION—CLAIMS AGAINST DIRECTORS—RIGHTS OF CREDITORS—STATUTES.

Where a corporation, whose only actual business was speculation on margins, which was left to the management of the president and treasurer, had issued bonds to the amount of $25,000, which were sold on fraudulent representations and with a premium of preferred or common stock, the proceeds of part of which, amounting to $11,000, was the only money ever received by it, and where its speculations were unprofitable, although it declared several dividends, and its assets were reduced to $1,000 in cash and an equity worth nominally $1,700, the directors' petition for a voluntary dissolution would be denied, and, if creditors desired, its corporate existence continued that they might assert the claims of the corporation against its officers and directors, as provided by General Corporation Law (Consol. Laws, c. 23) §§ 90, 91.

[Ed. Note.—For other cases, see Corporations, Cent. Dig. §§ 2424-2430; Dec. Dig. ⊂⇒610.]

Appeal from Judgment on Report of Referee.

In the matter of the application for a voluntary dissolution of the Great Northern Trading Company, a corporation. Application denied, and applicants appeal. Affirmed on opinion of Percival H. Gregory, referee.

The referee's opinion was as follows:

This is a proceeding, instituted by a majority of the directors of the Great Northern Trading Company, a domestic business corporation, for its dissolution. The order requiring all interested persons to show cause why the cor-

poration should not be dissolved was made returnable before me, as referee, and I have taken testimony and have made my report thereon as directed by the statute (General Corporation Law, §§ 186, 187).

The dissolution of the corporation is opposed by certain of its creditors who are holders of its bonds.

The corporation was created by the filing of its certificate of incorporation in the month of January, 1908. Its authorized capital stock was $100,000, of which $75,000 was to be common and $25,000 preferred, and it was stated that the amount of capital with which the corporation would begin business was $15,000.

The purposes for which the corporation was formed, as stated in its certificate, were, among others, to transact a general real estate and agency business including the management of estates; to act as agent for any persons or corporations dealing in real estate or personal property, making or obtaining loans, effecting insurance as agents; to conduct a general brokerage business, buy and sell stocks, bonds, etc., to develop and extend the business interests of firms, corporations, and individuals; to deal in securities or investments of any kind and generally with full power to perform any and all acts connected therewith or arising therefrom for the purposes of the business.

The only business actually done by the company has been to speculate on margin in stocks, cotton, and provisions. That the enterprise should end in a petition for voluntary dissolution on the ground of insolvency is, perhaps, not remarkable; but the conduct of the company's affairs has been, in many respects, so extraordinary that I am of the opinion that the petition of its directors for dissolution should not be granted in face of the opposition of its creditors.

On April 1, 1908, at the first meeting of the stockholders after the organization of the company, the petitioner Halsey was elected a director of the company, and the following resolution was passed: "Moved, seconded and carried by vote of all stockholders that Albert Halsey, of 166 Schermerhorn street, Brooklyn, N. Y., be and he is hereby authorized and directed to take all the money belonging to the company now and at any time hereafter belonging to the company and to invest the same at his own discretion for the benefit of the company, and at his own option and discretion and in his own name, but for the benefit of the company, and without giving any notice to the directors or officers or stockholders of said company, to buy or sell or to both buy and sell wholly at his own option and at such times and in such manner as to him shall seem best, any stocks or bonds or grain or cotton or provisions or other things and to begin and close such transactions at such time or times as to him shall seem best, employing for that purpose any broker or brokers he may see fit and placing with such broker or brokers all such orders as he shall deem for the best interest of the company and to compensate such broker or brokers at the usual and reasonable rate, such purchases or sales to be either made outright or on margin and such margin as said Halsey shall deem best, this authorization to include also the power to sell short and to place stop loss orders and to do all usual and proper things in connection with the purchase and sale or short sale of stock in his own name, but for the benefit of the company, and the treasurer of the company is hereby authorized, empowered and directed to deliver to said Halsey now and at any times hereafter all money of the company that said Halsey may call for to be disposed of as said Halsey may see fit."

A similar resolution was passed at a meeting of the directors held on the same day at which Mr. Halsey was also elected president of the company. Later in the same year he was also elected treasurer, and he has since been acting as both president and treasurer.

Subsequently the stockholders and the directors passed resolutions authorizing the issuance of bonds of the corporation to the amount of $25,000 and further authorized the issuance as a "premium" to each purchaser of such bonds of such an amount of preferred or of common stock, or of both, as in the discretion of the president might be found desirable in each case. The resolution also provided that "the bonds may be floated on such conditions as to price and all other matters as shall be deemed best by the president, and the differ-

ent respective bonds may be floated on different conditions and are not required to be floated on uniform conditions, as to prices, premiums or circumstances or maturity dates."

Bonds were accordingly prepared and were offered for sale upon representations of the most grossly false and fraudulent character. The offer of these bonds met with the customary response in such cases although, oddly enough, the subscriptions aggregated only $10,900. This sum was paid in by the purchasers, and bonds to that amount were issued to them. With each dollar in bonds so issued the company, with one or two exceptions, issued and gave away $1 of its preferred and $2 of its common stock.

The stock thus issued was not invariably given to the purchasers of the bonds. It was sometimes given in part to the intermediary who had procured the purchaser for the bonds, or, in the graphic phrase of one of the witnesses, to the person who had got the other person in. In this manner one of the witnesses who appeared before me and whose total investment in the concern was $100 became the owner of bonds to that amount and of stock to the amount of over $10,000.

It was from the sale of these bonds that the only money or property of value appears ever to have been received by or on behalf of the corporation, except that $500 was previously paid in by Mr. Halsey for preferred stock. This sum, however, was later credited to him as part of the purchase price of $1,000 in bonds.

The moneys thus received were all taken into the possession of the treasurer, pursuant to the resolution of April 1, 1908, and were by him deposited in his own name in various banks. In most cases they were mingled in the same accounts with his own moneys, and the only record of how much belonged to him and how much to the company was contained in memorandums made and retained by him. The same thing is true of moneys received as profits upon the speculative transactions conducted by him for the benefit of the company. The company itself kept no books of account.

With the moneys thus coming into his hands the treasurer entered upon the series of speculations in stocks, cotton, and provisions which has been its sole business since its organization. The transactions were made upon margin and consisted both of purchases for a rise and of so-called "short sales." These transactions were all conducted in the name of the treasurer, who was, at the same time, speculating for his own account through the same brokers. No separate accounts were kept of transactions intended for his own account and of those said to have been intended for the benefit of the company. No indication was given to the brokers, at the time the various orders to buy or sell were given, as to which orders were intended for his personal account and which for the account of the company. The only indication ever made of any differentiation between the two interests consisted of loose pencil memorandums made and retained by himself.

The speculations thus conducted for the company were not, according to the treasurer's account, profitable to the company. On the contrary, each year's operations resulted in a loss, and the net result of the six years' business is that the assets of the company are now reduced to $1,050 in cash together with its equity in 100 shares of New York Air Brake Company stock bought on margin and now pledged with the brokers to secure their advances. The value of this equity is estimated by the treasurer to be about $1,700, but it is impossible to say from the evidence before me what it actually amounts to, owing to the complications arising from the mingling of other speculation in the same account in which this stock was carried.

Notwithstanding the steady losses of the company from year to year, dividends were continuously paid to the stockholders at least once every three months from April 1, 1909, to July 1, 1913, and, during part of the time, once every month.

According to the treasurer's account, not only has the company lost all its own moneys, except the remaining assets above mentioned, but it has further lost $6,152.61 which he claims to have advanced to it and for which he waives any claim.

While I have not attempted to go into this account in detail or to pass upon its correctness in this proceeding, enough has appeared in the testimony to

show that charges have been made in the account against the company for disbursements made in matters with which it had no concern.

From the facts recited it seems plain that the corporation has at least an apparent cause of action against its officers and directors, or some of them, for maladministration of its affairs. It seems equally clear that the court cannot, in this proceeding, make any binding adjudication as to the existence or extent of that liability. I am of the opinion, however, that the petition of the directors for a voluntary dissolution of the corporation ought not to be granted, in the face of the objection of the creditors who have appeared in the proceeding and opposed the application. If they desire that the corporate existence be continued until they can have an opportunity to assert the claims of the corporation, in a representative action or otherwise, against its officers and directors, I think the opportunity should be given them. See Matter of Rateau Sales Co., 201 N. Y. 420, 94 N. E. 869; General Corporation Law, §§ 90, 91; Sage v. Culver, 147 N. Y. 241, 41 N. E. 513; Davis v. Wilson, 150 App. Div. 704, 135 N. Y. Supp. 825.

I am of the opinion therefore that the application should be denied, with one bill of costs to the respondent Bloxham and one bill of costs to the respondents Dryer, Moody, and McLoud to be paid by the petitioners personally, without prejudice, however, to a renewal of the application after the lapse of six months, provided there shall be no litigation then pending by, on behalf of, or against, the corporation.

I think I ought to call the attention of the court to the fact that, as appears from the testimony, several of the persons most actively connected with the affairs of this corporation were members of the bar of this court.

Argued before INGRAHAM, P. J., and CLARKE, SCOTT, DOWLING, and HOTCHKISS, JJ.

C. T. Kunkel, of Brooklyn, for appellants.
A. M. Schaffer, of New York City, for respondents.

PER CURIAM. Judgments and orders affirmed, with costs, on the opinion of Percival H. Gregory, Referee. Orders filed.

---

### HAUSER v. P. J. RITTER CONSERVE CO.

(Supreme Court, Appellate Term, First Department. May 13, 1915.)

ACCOUNT STATED ⬥⟁1—PROOF—JUDGMENT.
    Plaintiff in an action on an account stated, who conceded the defendant's contention that its manager had said at the time of the agreement that there were certain deductions to be made, failed to establish an account stated, and judgment against defendant could not be sustained.

    [Ed. Note.—For other cases, see Account Stated, Cent. Dig. §§ 1–8; Dec. Dig. ⬥⟁1.]

Appeal from Municipal Court, Borough of Manhattan, Fourth District.

Action by Henry Hauser against the P. J. Ritter Conserve Company. Judgment for plaintiff rendered by the court without a jury, and defendant appeals. Reversed, and judgment rendered for defendant without prejudice to a new action.

Argued April term, 1915, before GUY, BIJUR, and PENDLETON, JJ.

⬥⟁For other cases see same topic & KEY-NUMBER in all Key-Numbered Digests & Indexes